## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL ACTION NO. 1:20-cv-0072

KELLY WALKER              )
                              )
         Plaintiff,      )
                              )
v.                              )
                              )
ROBERT LAYNE DEESE, MARSH )
USA, INC. THOMAS HEATH )
WOODARD, DANIEL DEAN )
SHERRILL, JR. )
                              )
         Defendants.    )
                              )
                              )

**BRIEF IN SUPPORT OF THOMAS HEATH WOODARD AND RLI INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF SEAN PERRIN AND STEVEN EVANS IN SUPPORT OF BRIEF**

## I.    INTRODUCTION

On March 21, 2019, Kelly Walker was a passenger in a stolen U-Haul which took Clay County Sheriff's Office deputies on a nine minute and four mile high speed chase where the U-Haul 1) drove around closed road barricades; 2) came several feet from hitting North Carolina Department of Transportation workers; 3) ran over rocks and smashed poles at the entrance and exit of a public walking trail; 4) came several feet from hitting chief deputy Daniel Sherrill two times; 5) hit two Sheriff's Office patrol cars; 6) accelerated directly towards Clay County sheriff's deputy Thomas Woodard when he attempted to end the chase by blocking the road with his patrol car; and 7) tried to escape capture by driving into a field.    The

chase only ended after Woodard fired several shots into the U-Haul's grill, and then several shots at the U-Haul's front passenger tire when it drove onto the field. Walker was hit in the left calf, taken to the hospital and released the next morning. She then filed this lawsuit. [Document 7].

After the stipulated dismissal of all claims against Clay County Sheriff Robert Deese and Sherrill [Document 18], the following claims against Woodard remain: <u>First claim</u>: 42 U.S.C. § 1983 claim alleging excessive force and unreasonable seizure [Document 7, ¶¶ 63-75]; <u>Second Claim</u>: Battery, *id*. at ¶¶ 76-83; <u>Third Claim</u>: Implied Malice, *id*. at ¶¶ 84-92; and <u>Fifth Claim</u>: Negligence, *id*. at ¶¶ 101-106. RLI Insurance Company, the Sheriff's surety, is being sued pursuant to N.C.G.S. § 58-76-5. *Id*. at ¶¶ 113-117.

Woodard is entitled to summary judgment because, even viewing the evidence in the light most favorable to Plaintiff, *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 106 S.Ct. 2505, 2510 (1986), there is no genuine dispute as to any material fact and Woodard is entitled to judgment as a matter of law under Fed. R. Civ. P. 56(a) because his uses of force were objectively reasonable.

## II. <u>FACTS</u>

### A. <u>KELLY WALKER IS GIVEN A U-HAUL ON MARCH 20, 2019</u>

On March 20, 2019, after a day of picking moss in Clay County with her boyfriend Stephen Holmes, and Michael Ledford, Walker was offered the use of a

U-haul by Holly Lundsberg,[1] to transport the moss if Walker agreed to return the U-Haul to the rental store in Clay County. (KW 22: 1-6; 23: 11-13).[2] After loading the moss into the U-Haul, the trio drove to Walker's house in Cherokee County. (KW 24: 22-25; 25: 1-9).

The next day, Ledford, with Walker as his passenger, drove the U-Haul back to Clay County. (KW 31: 8-10, 16-25); [Document 7, ¶ 11]. Along the way, the U-Haul ran out of gas, and Walker and Ledford walked to her friend's house to get gas. (KW 32: 9-22; 33:3-22). After getting gas, Ledford and Walker dropped the friend, Michael Frady, off at the Shooting Creek Convenience Store ("Shooting Creek") and took the U-Haul to deliver moss to Walker's employer, Speedy Ledford. (KW 33: 3-22; 35: 1-2).

## B. THE U-HAUL IS REPORTED STOLEN ON MARCH 21, 2019

At around 1:06 pm on March 21, 2019, Charlie Shelton called Sherrill and informed him that the U-Haul he rented to Lundsberg was stolen. (DS 15: 19-24; DS Exhibit 52).[3] Ethan Henderson, a Clay County deputy sheriff, took the report,

---

[1]    The Amended Complaint refers to Lundsberg as Holly Lundquist. [Document 7, ¶ 12].

[2]    "KW" refers to the deposition of Kelly Walker, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1A to the declaration of Sean F. Perrin, Exhibit 1 to this Motion

[3]    "DS" refers to the deposition of Daniel Sherrill, followed by reference to page and line numbers or exhibit number, true copies of which are attached as Exhibit 1B to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

and entered the U-Haul as stolen in the National Crime Information Center. (EH 5: 21-15; 6: 1-12)[4]

After Frady was dropped off at Shooting Creek, the Sheriff's Office received information that the stolen U-Haul was at Shooting Creek. (DS 16: 23-25). Sherrill went to Shooting Creek and talked with Frady, who informed Sherrill that the U-Haul was headed to sell moss on Jackie Cove Road. (DS 17: 24-25; 18: 1-4). Sherrill asked Henderson and Sheriff's sergeant Steven Evans if they could locate the U-Haul. (EH 6: 19-22); (Evans Dec ¶ 2. ).[5]

In the meantime, Ledford and Walker finally made it to Ledford's house, unloaded the moss, got paid, and headed to return the U-haul. (KW 35: 16- 25). At around 4:27 pm, Henderson saw the U-Haul on Highway 64, confirmed that it was stolen, and initiated his blue lights and siren about 1/8 mile before Shooting Creek. (KW 36: 13-16); (EH 7:20-25; 8:1-7; 48: 24; 49:1-2); (DS, Exhibit 52, p. 3).

Sherrill heard radio traffic that the U-Haul was coming back towards Shooting Creek, so he turned on his blue lights and pulled out into the road to see if the U-Haul would pull into the Shooting Creek parking lot. (DS 19: 6-9). The U-Haul pulled into the parking lot behind Sherrill's car, and Walker thought

---

[4] "EH" refers to the deposition of Ethan Henderson, followed by reference to page and line numbers or exhibit number, true copies of which are attached as Exhibit 1C to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

[5] "Evans Dec." refers to the Declaration of Steven Evans, Exhibit 2 to this Brief.

Ledford was going to stop, but he got a "wild look on his face and eyes," drove around Sherrill, and back onto Highway 64. (EH 8: 22-24); (KW 38: 13-24; 39: 10-15); (DS 19:9-14).   A chase then ensued.

### C. CLAY COUNTY DEPUTIES ATTEMPT TO STOP THE STOLEN U-HAUL

#### 1. THE U-HAUL TRAVELS ON HIGHWAY 64

Henderson was immediately behind the U-Haul when it left Shooting Creek, and Sherrill and Evans were behind Henderson.  (DS 20: 13-14); (Evans Dec ¶ 4). The U-Haul accelerated to about 75 miles per hour on Highway 64, and on a straightaway, Sherrill and Evans drove around the U-Haul to attempt a "slowing maneuver."  (DS 20:14-17); (EH 10: 13-16).   In response, the U-Haul swerved towards the shoulder of the roadway to go around Sherrill and attempted to run Sherrill and Evans off the road.  (EH 11: 23-25); (Evans Dec ¶ 5).   Walker described this attempt as two police cars "trying to run us into the oncoming traffic, onto the guard rail from the front" for "three to seven miles." (KW 40: 1-7; 45: 1-6).   Cars had to go around the U-Haul to avoid hitting the U-Haul and the officers.  (KW 41: 7-10; 44: 19-24).

Evans and Sherrill were unsuccessful at the "slowing maneuver," so they got back behind Henderson. (EH 11: 23-25). Sherrill decided to get in front of the U-Haul and set up stop sticks but before he could do so, the U-Haul turned left onto

Highway 175. (DS 21: 12-16). At this point, the pursuit had travelled 2.7 miles. (DS, Exhibit 52, p. 5).

## 2. THE U-HAUL GOES THROUGH BARRICADES AND ENTERS HIGHWAY 175

Highway 175 was closed at the Highway 64 exit because at least nine Department of Transportation workers were doing clearing work and pipe replacement. (CM 5: 5-20, 24-25; 6:1)[6] When it turned left onto Highway 175, the U-Haul went through barricades where the road was blocked. (CM 8: 13-18; 30: 3-6). (EH, Exhibit 39, pp 1-2)[7] Charles Maney, one of the DOT workers, yelled at the other DOT workers to get out of the way because "somebody was going to get killed" because of the way the U-Haul was driving. (CM 14: 7-15; 30: 17-22). DOT workers scattered in all directions and jumped out of the road, and the U-Haul came within three feet of hitting a hearing impaired contractor. (CM 16: 15-20; 33: 11-18). When asked about going through the closed road, Walker replied: "it's fuzzy. I remember going across a bridge I thought was being worked on by DOT workers." (KW 51: 22-25; 52: 1-2).

## 3. THE U-HAUL HITS ROCKS AND SIGNS AND ENTERS A PEDESTRIAN WALKING PATH

---

[6] "CM" refers to the deposition of Charles Maney, followed by reference to page and line number, true copies of which are attached as Exhibit 1D to the declaration of Sean F. Perrin, Exhibit 1 to Brief.

[7] This Exhibit contains pictures of the barricades.

After going around the closed road barricades and almost hitting the DOT workers, the U-Haul continued on Highway 175.  (EH 14: 21-25). DOT workers David Bradshaw and Dylan Curtis were at the intersection of Elf School Road and Highway 175 flagging cars coming from Elf School Road.  (CM 7: 10-15; 8: 3-8). They were notified that there was a "high speed chase coming into the work zone" so they got behind their work truck.  (DB 6:12-24)[8]  The U-Haul came through this intersection and drove around barricades to get through.  (DC 13:22-25; 14:1-2).[9]

After the intersection of Highway 175 and Elf School Road, Evans attempted to get in front of the U-Haul, but the U-Haul slowed down and turned into a public fishing area off of Highway 175.  (EH 15: 8-13); (DS 23: 3-8).  The U-Haul drove towards the fishing area's walking path.  (EH 15: 22-23).  The U-Haul entered the path, hit a large rock, and hit the center pole which "caused the vehicle to come off the ground three to four feet."  (EH 16: 22-24; 17: 4-8; EH, Exhibit 50)[10]. Thinking that the U-haul was inoperable, Henderson parked his car and jumped out to give chase but, about fifty yards inside the walking path, the U-Haul took off again and continued on the walking path.  (EH 17: 8-15).

---

[8]      "DB" refers to the deposition of David Bradshaw, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1E to the declaration of Sean F. Perrin, Exhibit 1 to this brief.

[9]      "DC" refers to the deposition of Dylan Curtis, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1F to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

[10]      Exhibit 50 is a picture of this entrance.

Sherrill caught back up with the U-Haul near the public fishing area. (DS 22: 15-25; 23: 1-8). Sherrill saw the U-Haul turn into the walking path, and decided to place his patrol car in a position at the walking path's exit to block it. (DS 23: 15-19). The U-Haul ran over another sign at the exit, and drove past Sherrill while he pointed his gun at the U-Haul's driver. (DS 23: 20-24); (EH Exhibit 49)[11]. The U-Haul steered towards Sherrill and he "had to get out the way because he was coming right at me." (DS 25: 1-3).

When asked about this portion of the chase, Walker said that she never saw Sherrill flash his gun, but did acknowledge that the U-Haul hit "big things" and "a rock, some sign, and a –that pole." (KW 47: 3-6; 50: 15-16; 54: 7-13; 74: 7-25). Walker said that although it was "blurry," she recalls going "through signs and we went through bike trails and we went off roading it seemed like." (KW 46: 13-21). When asked about the "off-roading," Walker said "I can't, because it's all fuzzy and it happened so fast." (KW 50: 19-23).

### 4. THE U-HAUL TAKES A LEFT ON ELF-SCHOOL ROAD AND GOES "OFF-ROADING" IN A FIELD.

After leaving the walking trail, the U-Haul again went through "road closed signs" and took a left on Elf School where Curtis and Bradshaw were located. (DC 23: 2-7) Evans was immediately behind the U-Haul on 175. (Evans Dec. ¶ 9-10) Curtis and Bradshaw took cover behind their work truck and had to "juke and jive

---

[11] Exhibit 49 is a picture of this exit.

behind" their work truck because they "didn't know which way it was going to hit us." (DC 18: 15-22; 19: 11-14). Bradshaw "thought everybody in the work zone was in danger when he came through here." (DB 34: 17-20).

The U-Haul turned left on Elf School Road, and drove to Patterson Road, a dead-end road. (Evans Dec. ¶10) The U-haul made a left onto a field with a hill and woods surrounding it. *Id*; (EH, Exhibit 39, pp. 3-4)[12]; (DS 25: 17-25). The U-Haul went up the hill, turned around near some trees, did a circle and came back towards Sherrill. (DS 26: 3-13). Sherrill followed the U-haul, got out of his car, and screamed for the U-haul to stop. (DS 26: 20-25; 27: 1). At this point, Henderson had reached Patterson Road, and saw Sherrill outside of Sherrill's vehicle with a gun pointed at the U-Haul. (EH 18: 22-25; 19: 1-2). Sherrill "stutter stepped out the way" to avoid getting hit by the U-haul, and Henderson backed his patrol car to block the U-Haul. (EH 19: 2-10; 25: 1-2). The U-Haul came down the hill and rammed Evans' patrol car. (Evans Dec ¶11) The U-haul then went back up the hill, and down again, where it came over an embankment, and then hit Henderson's patrol car. (EH 19: 15-22). Sherrill got back in his car and continued chasing the U-Haul. (DS 25: 14-17)

Walker recalls Ledford doing a "figure eight" on the hill when Ledford "drove up, around, over and back down hill," but doesn't remember the U-haul

---

[12] This Exhibit contains pictures of the hill.

hitting the two patrol cars.  (KW 48: 8-10; 69: 23-25; 70: 1).  According to Walker, "that day was very fuzzy in the end."  (KW 49: 7-8).

### 5.  SHERRILL ORDERS WOODARD TO STOP THE U-HAUL

Woodard heard radio traffic that the "patrol guys" were in a chase and headed towards Elf School Road.  (TW 20: 24-25; 21: 1-3; 25: 5-6).[13]  When Woodard arrived at Elf-School Road, Sherrill told him to block the road and "Go on and to take him out" which meant "[g]et him stopped" because the U-Haul had taken out two cars.  (TW 25: 19-22).

Woodard pulled his patrol car to the middle of Elf School road at an angle, turned on his lights and siren, and pulled out his rifle.   (TW 26: 13-22; 28: 3-4; 34: 9-11).  Woodard was unsure of how many rounds were in his magazine but his clip holds 30 rounds.  (TW 43: 18-25; 55: 23-25).  At this point, Woodard knew that the U-Haul was fleeing, went through a closed road, hit two patrol vehicles, and that Sherrill had a "near miss with the vehicle". (TW 25: 1-4, 11-16). Woodard also knew that the U-Haul was headed towards the DOT workers and other traffic. (TW 29: 11-24).

After hitting Evans' and Henderson's patrol cars, the U-haul drove from Patterson Road to Elf-School Road, where it approached Woodard who was in the

---

[13]    "TW' refers to the deposition of Thomas Woodard, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1G to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

middle of the road. (Evans Dec. ¶13). The U-haul drove towards Woodard, dropped like it was slowing down, and then from about twenty yards away, the engine "rev[ved] and the front of the U-Haul pick[ed] back up" and the driver accelerated towards Woodard. (TW 34: 20-24; 35: 20-23). According to Maney, who drove to where Curtis and Bradshaw were located, and Curtis, both of whom were at the intersection of Highway 175 and Elf-School Road, Woodard had no time to retreat from the U-haul. (CM 40: 4-10); (DC 6: 2-3). Woodard fired shots at the front grill area of the U-Haul from about twenty feet away in order to "punch holes through the radiator," to get the driver to stop. (TW 32: 10-11; 38: 10-13; 52: 18-20). Walker estimates that the U-Haul was two car lengths away from Woodard when Woodard shot at the front grill. (KW 61: 24-25; 62: 1-3). Woodard is unsure how many times he fired his rifle during this first volley but Shannon Ashe, the SBI agent who was assigned to review the crime scene, found a bullet hole in the U-Haul's grill, but not the bullet itself. (TW 38: 5-9); (SA 48: 21-25; 49: 7-18). [14]

### 6. AFTER SHOOTING AT THE U-HAUL, THE U-HAUL GOES INTO A FIELD

The U-Haul did not stop after Woodard fired his shots at the front grill. Instead, the U-Haul turned into a field next to Elf School Road, passed Woodard's

---

[14] "SA" refers to the deposition of Shannon Ashe, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1H to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

patrol car, and attempted to come back up on Elf School Road towards the DOT workers. (DB 9: 24-25; DS Exhibit 53)[15].

When the U-haul drove onto the field, Sherrill drove around Woodard's car to block the exit out of the field because the U-Haul was going out towards where the DOT workers were working (DS 29: 11-16). Sherrill was "flying down there to try to block it in," and when the U-Haul saw Sherrill it turned right towards the field. (DS 33: 18-23). Sherrill drove his car into the field and the U-Haul changed direction and drove toward the field, and Woodard stepped to the roadway facing the field. (TW 39: 18-21). According to Bradshaw, the U-haul's tires began spinning and could not get out of the roadway. (DB 10: 1, 5-6).

While Sherrill and Evans were chasing the vehicle into the field, Woodard was about 50-60 yards away, and shot at the passenger side front tire "to simply stop the vehicle." (TW 40:6-11; 50: 17-23); (Evans Dec ¶¶13-14). Woodard believed that "[t]he danger was if the U-Haul came back up onto the road the same way that he went down running headlong into the two deputies that were still coming down Elf School Road." (TW 40: 21-25) After Woodard's shots, the U-haul stopped in the field and Ledford began to run. (Evans Dec. ¶14). Evans approached the passenger side of the vehicle and observed blood coming from Walker' calf so he contacted EMS to assist her. (Evans Dec ¶¶14-15). Walker was

---

[15]     Exhibit 53 in an aerial view of the field with Sherrill's depiction of the U-haul's path in the field.

treated at the hospital and released that next morning, and currently has three bullet fragments in her calf muscle. (KW 85: 14-19; 88: 10-11) Woodard never saw a passenger in the vehicle until Walker came out of the U-haul at the end of the chase. (TW 47: 14-18). The chase lasted about nine minutes and about 4 miles. (TW 51:1-3); (DS, Exhibit 52, p. 5).

Woodard is unsure how many shots were fired during the second volley, but Ashe observed three bullet holes in the passenger side door, but no bullet hole in the tire. (TW 41: 16-17); (SA 44: 16-23)  In total, Ashe found three empty shell casings at the scene including one in the roadway, and two in the grass on the edge of Elf School Road. (SA 5: 20-25; 6: 1; 18: 15-23; 19: 20-25; 20: 1-7).  Woodard had 18 rounds left in his magazine when it was turned over to the SBI. (TW 43: 18-25; 55: 23-25).

Although Woodard has been trained in the use of his rifle, and had been certified prior to March 21, 2019, he was not certified at the time of this incident. (TW 51: 20-24).  No criminal charges were brought against Walker, but Ledford was charged with several felonies, including three counts of assault with a deadly weapon on a law enforcement officer with a deadly weapon against Henderson, Evans, and Woodard, larceny of a motor vehicle, and several misdemeanors

including assaulting three DOT workers with a deadly weapon.  Exhibit 3. [16]  He

pled guilty to assaulting Evans and Henderson with a deadly weapon.  *Id.*

## III.  LEGAL ARGUMENT

### A.  42 U.S.C. § 1983 CLAIM AGAINST WOODARD

Plaintiff's excessive force and seizure claim is governed by the Fourth

Amendment's "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386,

109 S.Ct. 1865 (1989).  The objective reasonableness of a particular seizure under

the Fourth Amendment "requires a careful balancing of 'the nature and quality of

the intrusion on the individual's Fourth Amendment interests' against the

countervailing governmental interests at stake."  *Id*. at 396, 109 S.Ct. at 1871.

(internal quotation marks omitted). The inquiry requires analyzing the totality of

the circumstances "including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396, 109

S.Ct. at 1872 (internal citations omitted).

An officer's use of deadly force is subject to the same reasonableness

inquiry as other uses of force, and will generally be deemed reasonable if the

"officer has probable cause to believe that the suspect poses a significant threat of

death or serious physical injury to the officer or others."  *Tennessee v. Garner*, 471

---

[16] Attached as Exhibit 3 are true and correct copies of the court file in *State of North Carolina v. Ledford*, 19 IF 700111-12, 19 CRS 87-89, 50108-10, 14.

U.S. 1, 11, 105 S.Ct. 1694, 1701 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id* at 396-397, 109 S.Ct. at 1872.

Against this backdrop, it is clear that Woodard's uses of force on the first volley at the U-haul's grill, and second volley at the front passenger tire in the field were reasonable. *Streater v. Wilson*, 565 F. App'x 208, 211 (4th Cir. 2014) (unpublished) (when assessing the reasonableness of force, "non-continuous uses of force during a single incident" should be assessed separately).

## 1. WOODWARD'S FIRST VOLLEY WHEN THE U-HAUL IS ACCELERATING TOWARDS HIM

The reasonableness of Woodard's first volley towards the U-Haul's front grill is assessed based on the information he possessed when he fired. *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). When Woodard got to Elf School Road, he knew that the driver of the U-haul had committed several serious felonies, including assaulting officers, and that the driver was actively trying to resist arrest. (TW 25: 1-4, 11-16). Prior to firing the shot into the U-haul's grill, Woodard also knew that the U-haul was accelerating directly at him.

After Woodard got out of his patrol car, the U-Haul accelerated towards Woodard from about twenty yards away.  (TW 35: 20-23).   Although Woodard motioned for the U-Haul to stop, "instead of steering away from [Woodard] it steered towards him."  (CM 19: 8-10).   According to Maney, the U-haul driver "sheared down on the fuel, and in my opinion he was trying to run over that officer or run through him."  (CM 40: 12-14).    Curtis agreed: "[t]he U-Haul went toward him. Looked like it he was going to run over cop."  (DC 18: 5-6).  Woodard fired at the front of the U-Haul from about twenty feet hopefully getting the driver to just stop the vehicle."  (TW 52: 18-20).

Woodard's first use of force was reasonable under existing Fourth Circuit precedent, *Waterman v. Batton*, *supra*, and even according to Plaintiff's use of force expert, David Munday.  In *Waterman*, after about a ten minute chase, the Plaintiff drove up to a toll plaza, began coasting at around eleven miles per hour, and then began to accelerate towards the toll plaza.  *Id*.at 474. When the vehicle began accelerating, law enforcement officers were a variety of distances away from the vehicle ranging from 16 to 72 feet.  *Id*. None of the officers were directly in the path of the vehicle but stood a few feet to either side of the path of the incoming vehicle.  *Id*. at 474-475. The officers began firing their weapons as soon as the vehicle accelerated, and continued to fire at the vehicle from behind as Waterman drove through the toll plaza.  *Id*. at 475.  The Fourth Circuit concluded that the

officers had "probable cause to believe that Waterman's oncoming vehicle posed an immediate threat of serious physical harm" to the officers who shot. *Id*. at 478-479. The Court stated that this conclusion was based on the fact that the "suspect [was] well positioned to seriously injure or kill one or more of them with his vehicle - possibly within a fraction of a second - if they [the officers] did not employ deadly force." *Id*. at 481. The Fourth Circuit noted that the "closeness of the officers to the projected path of Waterman's vehicle is crucial to our conclusion that deadly force was justified." *Id*. at 479.

The facts surrounding Woodard's first volley are remarkably similar to the facts in *Waterman*. Like the Plaintiff in *Waterman*, Ledford led the officers on an almost ten minute chase, was not acting rationally, didn't stop despite officers pointing guns at him, and earlier had run officers off the road. *Id.* at 478-479. In this case, unlike *Waterman*, Ledford hit two patrol cars, and was headed directly at Woodard, whereas the officers in *Waterman* were on the passenger side of the vehicle *Id*. at 474-475.

Viewing the factual circumstances from Woodard's perspective, it is objectively reasonable that he perceived an imminent threat of serious harm both to himself and others. Deadly force may be employed to prevent escape "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11, 105 S.Ct.

at 1701.  Under *Garner*, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. at 11–12, 1, 105 S.Ct. at 1701.  The objective reasonableness of Woodard's first volley is also underscored by the fact that an officer can use deadly force to repel deadly force.   *Garner*, *supra*. Indeed, Plaintiff's expert, Munday, agreed that Woodard's fear that he would be hit and killed by the U-Haul as it was coming towards him was "appropriate."  (DM 49: 11-20)[17].  Munday agreed that with when faced with deadly force, an officer can use deadly force to defend himself. (DM 49: 22-25; 50: 1).  In addition, a  grand jury found probable cause that Ledford assaulted Woodard with a deadly weapon, and it is well-established that an officer can use force to defend himself.  Exhibit 3; See N.C.G.S. 15A-401 (d)(2) a (allowing use of deadly physical force where it appears necessary to defend oneself from the use or imminent use of deadly physical force), see *also Grisson v. City of Fayetteville* 2015 WL 5797661, at \*5 (E.D.N.C. 2015) (finding that a "vehicle driven directly at a law enforcement officer constitutes a deadly weapon.").

---

[17]        "DM" refers to the Deposition of David Munday, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1I to the declaration of Sean F. Perrin, Exhibit 1 to this Brief.

Clearly, Woodard's first volley towards the U-haul was a reasonable use of force to both stop the rampaging U-haul, and to protect himself from being hit by the U-haul. *See Bethea v. Howser*, 447 F.Supp.3d 497, 513 (E.D.Va. 2020) (officer's use of force in firing at a motorist who was directly accelerating towards him was reasonable because "the Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm.")

### 2. <u>WOODWARD'S SECOND VOLLEY<br>WHEN THE U-HAUL IS IN THE FIELD</u>

Woodard's second volley was also reasonable. Although Woodard was not defending himself during this second volley, he had probable cause to believe that, if allowed to escape, the U-haul posed a threat of serious physical harm to others. *Garner*, *supra*. In addition, the U-haul already committed numerous instances of crimes involving the threat of serious physical harm towards Woodard and others. *Garner*, *supra*. When Woodard fired the second shot, he knew that the driver of the U-haul committed felony assaults on Evans, Henderson, and possibly Sherrill. He also knew that the U-haul had evaded capture by going through barricades, and refused to stop even after Woodard fired his first volley.

According to Woodard, he fired this second volley because "the fact that a vehicle can travel long distances at fairly rapid speeds puts people in danger a whole quicker than somebody on foot would. So in a matter of seconds that vehicle could have been back up on the roadway." (TW 49: 7-13). Woodard also

knew that the U-Haul "was headed back out in the same direction where those DOT workers were at and to the possibility of getting into other traffic." (TW 29: 11-24).

In fact, after the first volley, the U-Haul did not stop. Instead, it evaded Woodard by driving onto the field and attempting to come back up on Elf School Road towards the DOT workers. (DB 9: 24-25; 10: 1) The U-Haul was between 10-25 feet away from the DOT workers when it tried to get back onto Elf School Road. (DC 25: 14-15). (DB 33: 23-25; 34: 1-10) At this time, Curtis feared that the U-Haul might hit them. (DC 25: 16-17).

Certainly, Woodard's assessment that the U-Haul was trying to escape from the field was reasonable. Maney told his workers to get behind the work truck because "the fact that it was trying to come back into the road again…[i]n my mind I was assuming that if it was allowed to come back in the road again that we would be in danger again." (CM 31: 23-25; 32: 1-11). When asked whether the U-Haul was "[t]rying to get out of the field, I guess", Sherrill responded "[y]es." (DS 42: 7-8). It was even shared by Plaintiff. When asked why Ledford went down the grassy embankment, Walker stated "everyone…suspected [w]hen the road was blocked he was trying to get around to the other one [and] that's what I assumed." (KW 117: 18-25)

Certainly, Woodard's assessment that the U-Haul was going to cause a danger if it left the field was reasonable. It was shared by others observing the situation as well. Bradshaw elaborated on the danger of the U-haul coming back on the road: "sure you feel in danger…And when they was coming back into this work zone…I'd rather he stopped him—I mean, if he came back in this work zone a lot of people that—everybody's working. Who knows what could have taken place…I'm glad it came to a halt. It's put in like that. Somebody had to do something." (DB 35: 17-24; 35: 1-2).

After attempting to get back onto Elf-School road, Ledford "drove up, around, over and back down the field". (KW 69: 23-25; 70: 1) The U-Haul turned towards Woodard's direction like "they were going to come back out into the road toward where I was at, and I fired again when they were down in the field." (TW 32: 17-20) The U-haul only stopped when Woodard fired this second volley at the tire.

Given what Woodard knew when he fired this second volley, his use of force was a reasonable decision to stop a rampaging U-haul which had already demonstrated disdain for property, human life, and law enforcement commands.

### 3. WOODARD IS ENTITLED TO QUALIFIED IMMUNITY FOR BOTH USES OF FORCE

Even if Walker has demonstrated that her constitutional rights were violated, Woodard is protected by qualified immunity since he did not violate Walker's

clearly established rights. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

A Court reviewing qualified immunity considers whether "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). If there has been no constitutional violation, the officer is entitled to qualified immunity. *Id*. If the facts could establish a constitutional violation, the Court must analyze whether the constitutional right alleged to have been violated was "clearly established" at the time of the officer's actions. *Id*. *See also Pearson v. Callahan*, 555 U.S. 274, 236, 129 S.Ct. 808, 818 (2009) (noting that district courts do not have to follow the precise two-step order set forth in *Saucier.*)

The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition. . .." *Saucier*, *supra*. The law is "clearly established" for qualified immunity purposes by decisions of the U.S. Supreme Court, Fourth Circuit Court of Appeals,

or the highest court of the state where the case arose. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc).

The assessment of qualified immunity must filter the objective facts through the perspective of the officer at the time that force was employed. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). Woodard is entitled to qualified immunity on the first volley under *Waterman*. Under *Waterman*, it was not clearly established that firing shots at a vehicle accelerating towards an officer from 20 feet away violated Walker's rights. In fact, when asked about what else Woodard should have done with the U-Haul accelerating towards him Munday responded: "Good question. And then many officers, it's quick, you only have seconds to make that decision and I understand that…A vehicle was coming towards him at that time and he felt that his life was possibly endangered so he elected to fire those shots into the grill of the truck to try to disengage it that way." (DM 39: 8-24).

For Woodard's second volley, it was not clearly established that firing a shot at the passenger tire of a car to stop it after it had evaded law enforcement for about four miles, hit rocks and poles, and went "off-roading" in an attempt to escape, and hit two patrol cars with a large vehicle violated Walker's rights. *See Mullenix v. Luna*, 577 U.S. 7, 13, 136 S. Ct. 305, 309 (2015) (correct test for whether an officer violated a clearly established right is based on the "situation [the

officer] confronted." In *Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 598 (per curiam) (2004), the United States Supreme Court held that an officer did not violate clearly established law when shooting a fleeing suspect out of fear that the driver endangered "the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the driver's] path and for any other citizens who might be in the area." In this case, Woodard fired for virtually identical reasons: to protect Evans and Sherrill who were chasing the U-haul in the field, and to protect DOT workers and members of the public who may have been in the road where the U-haul was headed.

Woodard had the possible options when the U-haul was in the field: 1) shoot like he did; 2) not shoot but let the U-haul continue to drive in the field and possibly cause harm to others; 3) let the U-haul continue to drive in the field and then shoot if it came up to his position again; or 4) get in his patrol car and join the chase in the field. Certainly, any reasonable officer when confronted with this situation would have chosen the same path as Woodard. That is the very essence of qualified immunity- officers cannot be held liable for making bad guesses, but only for "transgressing bright lines." *Anderson v. Creighton*, 483 U.S. 635, 639-640, 107 S. Ct. 3034, 3039 (1987

C.     **THE STATE TORT CLAIMS SHOULD BE DISMISSED**

The Plaintiff's state tort claims of battery, implied malice, negligence, and action on bond, should also be dismissed because Woodard is entitled to public official immunity. Public officials performing discretionary acts are absolutely immune from mere negligence claims unless the officer acts with malice. *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d. 888, 890 (1984). An officer acts with malice "when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* (internal citations omitted). As set forth earlier, Woodard is entitled to qualified immunity on the federal claim because he acted reasonably, and he therefore is entitled to public official immunity on the state claims. *See Cooper v. Sheehan*, 735 F.3d. 153, 160 (4th Cir. 2013) (noting that public official immunity analysis is "functionally identical" to qualified immunity analysis.) Last, the action on bond statute, N.C. Gen. Stat. § 58-76-5, allows for a suit by a person "injured by the neglect, misconduct, or misbehavior in office of any ... sheriff.." This is a derivative claim and since there is no negligence by Woodard, the claim against RLI falls.

## IV.   CONCLUSION

As set forth above, Woodard's use of forces were reasonable. As a result, the Defendants are entitled to summary judgment on all claims in the Amended Complaint.

/s/ Sean F. Perrin
Sean F. Perrin, N.C. State Bar #22253
Womble Bond Dickinson (US) L.L.P.
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, NC  28202-6025
Telephone:  (704) 331-4992
Sean.perrin@wbd-us.com
***Attorney for Defendants***